Filed 6/10/16  In re Hallie R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re HALLIE R. et al, Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> COREY M., <br><br> Defendant and Appellant. | F072976 <br><br> (Super. Ct. Nos. JD134256-00, JD134257-00, JD134258-00) <br><br> **OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  William D. Palmer, Judge.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Theresa A. Goldner, County Counsel, and Kelley D. Scott, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Gomes, Acting P.J., Kane, J. and Detjen, J.

Corey M. (mother) appeals from the juvenile court's jurisdictional findings and dispositional orders as to her three daughters, now seven-year-old Hallie, five-year-old Mia and two-year-old Jasmine. She contends there was insufficient evidence to adjudge the children dependents under Welfare and Institutions Code section 300, subdivision (b)[1] and to order them removed from her custody. (§ 361, subd. (c).) We affirm.

PROCEDURAL AND FACTUAL SUMMARY

In March 2015, mother contacted the Kern County Department of Human Services (department) and, sounding very distraught and tearful, stated that she could no longer handle her children and wanted someone from the department to pick them up. She said she was afraid of what she might do, but also immediately added that she would "never hurt [her] children." The police were contacted and an officer responded to the home. Mother told the officer she was under extreme stress because of ongoing personal and family issues. She said she had no family in the area and did not know where Joseph,[2] her husband and the children's father, was. While mother was speaking to the officer, Joseph returned home. He was shocked that mother had contacted the department. The officer explained to Joseph that he did not have to relinquish the children. Joseph said he did not want to oppose mother and believed it would be in the children's best interest since he and mother had some issues they needed to work out.

Social worker Shelley Nisperos met with mother at the family home. Mother told Nisperos that things were hard and she could not handle taking care of the children anymore. She said she had been working with a social worker and that she had previously had children adopted. She would not provide any further detail but said she just wanted her children to be safe. She had prepared two plastic bins with the children's

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     Joseph is not a party to this appeal.

belongings along with their birth certificates and social security cards.   Nisperos took the children into protective custody and placed them in foster care.

Social worker Jason Montez was assigned to investigate the referral.  Mother told Montez she was just "stressed out" and that she and father were having marital problems. She did not know what to do under the circumstances other than give the children up. She said Joseph had an appointment for mental health treatment and she wanted to join him in counseling.  She was unsure if she had bipolar disorder and was not taking medication.  She told Montez she and Joseph only had one incident of domestic violence and it occurred in February 2015.  She denied ever using drugs but refused to drug test unless the court ordered it.  When Montez asked her if Joseph was still living in the home she would not directly answer him.  After Montez explained the danger of having him there given their domestic violence and possible mental health issues, she denied that domestic violence was a problem.  She also told Montez she wanted the children's godmother, Megan, to take custody of them.

Megan told Montez she thought mother may be suffering from post-partum depression.  She had never witnessed mother and Joseph engage in domestic violence, but thought Joseph may be using drugs and referred to him as a "tweeker" because he was constantly moving.  She added that mother had lost custody of three other children.

Montez researched the family's child welfare history and found a report of domestic violence in August 2009, during which Joseph shoved mother, causing her to stumble backward and hit her back on the television.  Mother grabbed Hallie and fled. Mother and Joseph denied substance abuse but stated they were diagnosed with bipolar disorder for which neither of them were being treated.  Mother said that Joseph verbally abused her but had never been physical with her before.  Both parents agreed to get help for domestic violence, and Joseph agreed to pursue mental health treatment.  The agency lost contact with the family but considered them high risk.

3

Montez also found a report received in April 2013 in San Bernardino County that a family was living in a van parked outside a store. A woman was seen hitting a child multiple times, and a male was heard yelling at the child, "Fuck you." The male and female were Joseph and mother who were living with then four-year-old Hallie and two-year-old Mia in a van. Mother and Joseph denied any drug abuse, mental health issues or criminal history. However, Joseph had a warrant for his arrest for drug possession and mother admitted she would test positive for marijuana. Joseph was arrested and the children were taken into protective custody. A petition was filed on behalf of Hallie and Mia alleging mother and Joseph's substance abuse, unresolved mental health issues, domestic violence, and failure to provide a safe and appropriate home placed the children at a substantial risk of harm. At the jurisdictional hearing on the petition, evidence was presented that mother tested positive for methamphetamine in April 2013, and that she and Joseph told a social worker conducting a child welfare investigation in 2009 that they both had untreated bipolar disorder. The juvenile court exercised its dependency jurisdiction, removed the children from parental custody and ordered mother to participate in domestic violence counseling, parenting instruction and to submit to random drug testing. The court did not order reunification services for Joseph. In December 2013, the juvenile court returned the children to mother's custody at the six-month review hearing and dismissed the petitions.

Montez also discovered the February 2015 domestic violence to which mother referred. She and Joseph were arguing in their living room when Joseph shoved her in the chest with both hands, causing her to fall backward onto the couch. When she got up, he pushed her again. Jasmine was in the room during the physical altercation. Mother grabbed Mia and Jasmine, left the residence and called the police. Joseph was arrested at the residence. The next day, someone reported that mother and Joseph regularly argued and appeared to be using drugs. They were up a lot at night and people could be heard entering and leaving their residence all night long. A known drug dealer had been seen

4

leaving their residence the day before. In addition, mother and Joseph could be heard calling the baby "M'fer" when the baby cried, and Mia appeared to be pale and lethargic and had what appeared to be a bruise under her left eye. The reporter was concerned that mother and Joseph gave the children medication to keep them quiet or asleep because there were times when the children could not be heard for a couple of days at a time, which was unusual. In addition, the family had no furniture and ran out of food by the 19th of the month. The house was so infested with roaches that the roaches were coming out of the electrical sockets.

Montez filed a dependency petition on behalf of Hallie, Mia and Jasmine, alleging they came within the juvenile court's jurisdiction under section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). The petition alleged three counts under subdivision (b) (hereafter "count b-1, b-2 and b-3"). Count b-1 pertained to mother and Joseph and alleged that the children were at substantial risk of suffering physical harm or injury because of the domestic violence between the parents. As supporting evidence, count b-1 cited the details of the domestic violence incidents that occurred in August 2009 and February 2015. Count b-2 concerned mother only and alleged that she placed the children at risk of physical harm or injury because of her undiagnosed mental health issues. As supporting evidence, the petition cited the fact that mother asked that the children be removed from the home in March 2015 because she was stressed and could not appropriately care for the children. Count b-3 pertained to father only and alleged that his mental health issues, particularly his bipolar disorder, placed the children at risk of harm or injury. The subdivision (g) allegation consisted of one count pertaining to both parents, stating they were unwilling or unable to care for the children.

The juvenile court conducted a contested detention hearing. Mother testified that she wanted the children returned to her custody. She said her purpose in calling the department was to obtain counseling services, not to have her children taken from her. She said she had been working with a social worker prior to that call. She denied ever

5

having been diagnosed with bipolar disorder or any other mental illness. At the conclusion of the hearing, the juvenile court was prepared to release the children to mother's custody under the condition father only have contact with them under the department's supervision. However, the court ordered the children detained after mother questioned whether she could decide when father had contact with the children.

The juvenile court convened a jurisdictional/dispositional hearing and continued it to May 2015. Meanwhile, the department received information that father was arrested in February 2015 for indecent exposure. He was found standing on the sidewalk outside a school fence with his pants down to his knees, exposing his genitals. He was masturbating with his right hand and holding his testicles with his left hand. He was also in possession of suspected methamphetamine and a glass smoking pipe. Joseph denied exposing himself to children, and angrily stated that he was at the school to pick up a friend's child. He also denied recent drug use and said he was holding the glass pipe for a friend.

A week after Joseph's arrest, one of the students who observed Joseph gave a statement to a detective. He said he saw a young male with several tattoos on his body standing by the fence. The man pulled off his shirt and put it over his head, covering his face except his eyes. He pulled his pants down to his thighs and was getting ready to pull his underwear down when the student ran to tell someone. He said the man told him, "I know what you look like," which the student interpreted to mean that the man was going to murder him.

The department filed a first amended petition to include the details of Joseph's arrest. It resulted in the addition of count b-4 concerning Joseph's arrest for drug possession, and one count under section 300, subdivision (d) (sexual abuse) concerning his arrest for indecent exposure.

In May 2015, the juvenile court conducted an initial hearing on the first amended petition and mother and Joseph denied the allegations. The court deemed Joseph the

6

presumed father of all three children and set a jurisdictional/dispositional hearing on the amended petition. Prior to the hearing, the department filed a supplemental report advising the juvenile court in part that the foster father believed mother was still in contact with Joseph. He recounted an instance in early May 2015 when mother showed him some pictures of the children that she had on her cell phone. She said she had to be careful because Joseph had put pictures of his genitalia on her cell phone. The foster father was concerned because mother allowed the children to play games on her phone.

In October 2015, after multiple continuances, the juvenile court conducted a contested jurisdictional hearing. Mother testified she was no longer in a relationship with Joseph and had not been since a little before she called the department in March. She said he left the home at the end of February but may still have some articles of clothing there. She was asked whether Joseph's arrest for masturbating in front of school children and possession methamphetamine concerned her for her children. She said she did not believe Joseph was the man identified at the school because he was not a young man and did not have tattoos. However, it would concern her that he was in possession of methamphetamine.

Jason Montez testified that mother completed a mental health evaluation for the department and did not meet the criteria for specialty mental health services. He also testified that mother denied any mental health issues and he did not discover that she had any mental health diagnoses in his investigation of the case. He testified that he believed mother and Joseph were still together because she had recent photos of Joseph on her cell phone and because she said she would have to consult him when one of the girls wanted her ears pierced.

At the conclusion of the hearing, the juvenile court sustained counts b-1 through b--4 but dismissed the subdivision (d) and (g) counts. The court set the matter for disposition.

In its report for the dispositional hearing, the department informed the juvenile court that in May 2002 mother, then a 13-year-old juvenile dependent, was diagnosed with major depressive disorder, severe post-traumatic stress disorder and oppositional defiant disorder. In February 2003, mother ran away from a children's shelter. By March 2004, she had a warrant for her arrest and, according to her mother, planned on going to Las Vegas with then 26-year-old Joseph. She subsequently had three children that she gave up for adoption. The department also reported that mother had been semi-cooperative and regularly visited the children. In addition, she was participating in the Learning to Protect/Failure to Protect from Domestic Violence and Sexual Abuse Program (hereafter "Learning to Protect") and making good progress. She completed a mental health screening and did not qualify for specialized mental health services. The department still believed she had some mental health issues that needed to be addressed and referred her for a mental health assessment twice. However, mother refused to attend the appointments and refused to drug test. The department recommended the juvenile court order the children removed from mother and Joseph's custody and order them to participate in reunification services.

On October 27, 2015, the juvenile court convened the dispositional hearing. County counsel advised the court that someone from the department went to mother's home the day before and found articles of father's clothing there. However, other than the presence of Joseph's clothes, the department did not find anything in the home that would pose a danger to the children. Mother's attorney advised the court that mother had completed 21 of the 25 Learning to Protect group sessions, and was willing to participate in any mental health counseling that was ordered. He asked the court to return the children to mother under family maintenance.

At the conclusion of the hearing, the juvenile court ordered the children removed from parental custody, ordered mother and Joseph to participate in reunification services, and set a six-month review hearing for April 2016.

8

This appeal ensued.

## DISCUSSION

Mother contends the jurisdictional findings as to her should be reversed because there was insufficient evidence at the time of the jurisdictional hearing that she suffered a mental illness or that the children were at a substantial risk of harm because of domestic violence between her and Joseph.[3] We disagree.

When the sufficiency of the evidence to support a finding or order is challenged on appeal, we review the record to determine if substantial evidence supports the conclusion of the trier of fact. In doing so, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences in support of the court's findings and orders. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Section 300, subdivision (b) applies when "the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the parent … to adequately supervise or protect the child, or … by the inability of the parent … to provide regular care for the child due to the parent's … mental illness …." A finding under section 300, subdivision (b) requires three elements: "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820 (*Rocco M.*).)

The " 'basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' " (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) Evidence of past events may be probative in assessing the

---

**3** Mother persuades us that her challenge to the juvenile court's findings as to her under section 300, subdivision (b) are justiciable even though any decision we might render on the allegations involving her would not affect the juvenile court's jurisdiction over the children since the jurisdictional findings as to Joseph are unchallenged. (*In re I.A.* (2011) 201 Cal.App. 4th 1484, 1490-1495.)

current conditions "if circumstances existing *at the time of the hearing* make it likely the children will suffer the same type of 'serious physical harm or illness' in the future." (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388.)

The defined risk in this case as to mother is the possibility that she might harm the children. It was her fear of what she might do and her frantic call to the department that necessitated their initial removal. Mother was adamant that the department remove the children immediately for their safety and she apparently intended more than a temporary separation because she wanted to send many of their belongings with them, including their important documents. Though mother never specified what she feared doing, her history of child abuse lends itself as a possibility. Further, though mother denied suffering a mental illness, there is ample evidence from which to infer that she does or may. She reported in 2009 that she suffered from bipolar disorder, and it was her untreated bipolar disorder that caused the juvenile court to exercise jurisdiction over Hallie and Mia in 2013. In addition, mother questioned whether she had bipolar disorder when she contacted the department to remove the children in this case.

Mother, however, argues other evidence proves that she does not have a mental illness, pointing to Montez's inability to discover a mental health diagnosis for her and the mental health screener's conclusion she did not qualify for specialty mental health services. According to the record, however, mother did not seek mental health treatment. Therefore, it stands to reason that Montez would not be able to find a diagnosis for her. Further, Montez testified that the screener determined mother did not qualify for mental health services based strictly on the information mother provided. If mother was not forthcoming about her mental health history, then the results of her screening would not be valid.

Based on the foregoing, we can infer that mother's yet undefined mental health problem, in combination with her own fear for her children's safety, placed the children at a substantial risk of harm.

We can also infer from this record that domestic violence between mother and Joseph placed the children at a substantial risk of harm. They had multiple incidents of domestic violence, the most recent occurring a month before mother made her frantic call. In addition, Jasmine was present during the dispute and, despite mother's assertions that she and Joseph were no longer in contact, there was evidence from which to infer that they were.

We thus conclude substantial evidence supports the juvenile court's jurisdictional findings as to mother under section 300, subdivision (b). For the same reasons, we conclude substantial evidence supports the juvenile court's removal order as we now explain.

Section 361, subdivision (c), the governing statute, provides in relevant part: "A dependent child shall not be taken from the physical custody of his or her parents … with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence …:  [¶]  (1) [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's … physical custody."

In determining whether to order a child removed from parental custody, the juvenile court is not required to find the child was harmed. (*In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) The juvenile court only has to have some reason to believe that circumstances which place the child at a substantial risk of harm would continue in the future. (*Rocco M*., *supra*, 1 Cal.App.4th at p. 824.) The parent's level of denial is an appropriate factor to consider when determining the risk to the child if placed

with the parent. Ultimately, the purpose of the removal statute is to avert harm to the child. (*In re Jamie M*. (1982) 134 Cal.App.3d 530, 536.)

We review the juvenile court's removal order for substantial evidence, bearing in mind the heightened burden of proof. (*In re Henry V*. (2004) 119 Cal.App.4th 522, 529.) We conclude substantial evidence supports the juvenile court's order.

The children were taken into protective custody because mother could no longer take care of them and was afraid of what she might do. She explained that she and Joseph were having marital problems and that she was stressed. She denied, however that domestic violence, mental illness or drug abuse were problems for them despite evidence to the contrary, and she maintained contact with Joseph though she knew the risks to herself and the children. Given the volatility of the family situation and mother's refusal or inability to protect the children from it, there was no reason for the court to return the children to mother's custody. There were no assurances that the next time mother was stressed out she would have the wherewithal to contact the department before she actually harmed the children.

Mother nevertheless argues that a formal removal order was not necessary because she was cooperative, and a voluntary service plan would have been more appropriate in her case.[4] We disagree. Mother was cooperative to the extent that she visited the children and participated in the Learning to Protect Program. However, she refused to drug test and complete a mental health assessment. In addition, there was no guarantee that mother would not leave with the children as she had done in the past. The

---

[4]    Appellate counsel also argues that respite services under section 16500.5, subdivision (c)(1) (which counsel mistakenly denotes as § 16500, subd. (c)(1)) were an alternative to removal, and that mother's trial counsel presented this argument to the juvenile court. Trial counsel in fact raised the issue of respite services at the jurisdictional hearing and, after a brief discussion, the juvenile court determined that such a program was not available. At the dispositional hearing, mother's trial counsel argued for family maintenance services in lieu of removal.

risk to the children in mother's custody was simply too high and a voluntary services plan would not have reduced that risk in her case.

Mother also attempts to support her position by citing and briefly discussing several cases[5] in which the appellate court reversed the juvenile court's removal order. She fails, however, to show that any of the cases are factually on point or legally instructive.  Thus, we decline to discuss them.

## DISPOSITION

The jurisdictional findings and dispositional orders entered on October 30, 2015 are affirmed.

---

**5**     Mother cites *In re James T.* (1987) 190 Cal.App.3d 58, *In re Steve W.* (1990) 217 Cal.App.3d 10, and *In re Paul E.* (1995) 39 Cal.App.4th 996.